UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80907-Civ-DMM

ENVIRONMENTAL PROGRESS, INC.,
a South Carolina corporation, individually
and as the representative of a class of similarly
Situated persons,

    Plaintiff(s)

vs.

METROPOLITAN LIFE INSURANCE COMPANY,
STORICK GROUP CO., THE STORICK GROUP
CORPORATION, SCOTT R. STORICK and
JOHN DOES 1 – 10,

    Defendants.
_____/

**MOTION OF CROSS DEFENDANT, SCOTT R. STORICK, TO INVOLUNTARILY DISMISS CROSSCLAIM BASED UPON SPOLIATION OF EVIDENCE OR, ALTERNATIVELY, FOR OTHER SANCTIONS**

The Cross Defendant, SCOTT R. STORICK ("Storick"), by and through his undersigned attorney, moves to involuntarily dismiss the crossclaim of Cross Plaintiff, METROPOLITAN LIFE INSURANCE COMPANY ("MetLife"), based upon spoliation of evidence or, alternatively, for other sanctions.  Storick seeks an order of dismissal, with prejudice, or an order providing for other sanctions, and in support of this motion asserts as follows:

    1.    Plaintiff has sued Defendants STORICK GROUP CO., THE STORICK GROUP CORPORATION,SCOTT R. STORICK, as well as METROPLITAN LIFE INSURANCE COMPANY, pursuant to 47 U.S.C. §227 asserting a violation of section (b)(1)( C), the Junk Fax Prevention Act  of 2005 ("JFPA").  Presently pending before this

Court is Plaintiff's amended complaint [D.E. #32], although Plaintiff has since moved to amend its pleadings [D.E. #61]. In effect, Plaintiff has alleged that Storick and MetLife engaged in a campaign of fax blasting insurance solicitations, hereinafter referred to as "fax leads", for the purpose of securing potential customers and/or clients.

2.   At all relevant times as alleged in Plaintiff's amended complaint and MetLife's crossclaim, Storick was an employee of MetLife working out of the MetLife office located at 5900 North Andrews Avenue in Fort Lauderdale, Florida [D.E. #39, pp. 9 - 10, ¶¶ 5, 12, and 17; D.E. #56, pp. 9 – 11, ¶¶ 5, 12, 17]; Exhibit "A" excerpt attached hereto, which are excerpts from the Storick deposition , pages 19 – 20; 212 -213. Storick, a top producing insurance agent, as part of his employment responsibilities, sold life insurance on behalf of MetLife. Exhibit "A" excerpt, p. 121, lines 7 – 25; p. 121, lines 1 – 19. On November 2, 2012, Storick was terminated by MetLife as an employee. [D.E. #s 39 and 56, p. 9, ¶5].

3.   After MetLife learned of this lawsuit, the 2011 and 2012 MetLife files for Storick, those that resulted in an insurance policy being issued, were taken from the shelf by MetLife for review in order to determine if any fax leads were contained therein. Exhibit "B" attached hereto, which is the deposition transcript of Alma Dominguez, page 83, lines 19-24. Alma Dominguez was and remains an assistant to Storick and is also a MetLife former employee. Alma Dominguez was also terminated as a MetLife employee on November 2, 2012. It should be noted that Gil Cohen was and is the managing director of the Fort Lauderdale office of MetLife and Sue Palen was and is the office manager. Exhibit "B", pp. 119 – 120. Further, as evidenced in Exhibit "B", p. 175, lines

6-21, Kathy Novick was in charge of compliance within MetLife's Fort Lauderdale office.

  4. After notice of this lawsuit, and one week prior to investigators or auditors arriving, pursuant to Alma Dominguez, Exhibit "B", pp. 75-77:

  Q. (Mr. Kelly): When you're saying these, you're referring to Exhibit "4"? [1]

  A. The fax leads, right. When the investigators were in – the week before the investigators came in Susan Palen had Theresa Douberly and Kathy Novick go through and pull of these out of our files and they found –

  A. Theresa Douberly and Kathy Novick, they came with a list of all of Scott's business from 2011 and 2012, and they had our team pull every single application that was written, and they pulled all these out.

  Q. And when you saying "these", your talking about the –

  A. These fax leads. They pulled all these out. There was a lot. I can tell you there was a lot.

  Q. And when you say "they", you're referring to Susan, Theresa, and Kathy Novick?

  A. Susan didn't do. Theresa and Kathy did.

  Q. All right, And this was done in 2011; is that right?

  A. This was done in 2012, the week before they fired me.

  Q. (Mr. Zacherl): You actually see that Alma?

  A. Oh, yeah, I helped.

  Q. See them taking them out?

  A. Yeah. They were in the office behind me. They had my team pull all of them, pull all these out, pull out any document that shouldn't have been in it and they put them in a box. They were asked to destroy a bunch of these.

  Q. Who was asked to destroy a bunch of those?

---

[1] Exhibit 4 is attached hereto and made a part hereof as Exhibit "C". The same Exhibit 4 is also referred to in Exhibit "D" attached, which is the deposition transcript of Nicole Alexander.

> A.   They said "get rid of them. We don't want them."
>
> Q.   Kathy and Theresa said that?
>
> Q. (Mr. Kelly):   To who?
>
> A.   That's what I was told. They were told to "clean them out." That when the auditors came they wanted the files to be in good order.

During the review of the Storick files for 2011 and 2012, the fax leads contained therein were summarily removed by MetLife, Exhibit "B", pages 76 -79. According to the testimony of Alma Dominguez, the search for the fax leads were specifically in response to this lawsuit, Exhibit "B" page 83, lines 2 – 24:

> Q. (Mr. Kelly):   So Susan Palen told you that search that Theresa and Kathy did was in response to a lawsuit, correct?
>
> A.   Right. The investigators had come and they had pulled a lot of our files, and these were in it.
>
> A.   And after the investigators left Sue came over and she said, "I didn't know that there were that many." She said "we have to get these fixed. I have a feeling that they're coming again. We have to get them cleaned." And I said, "it's impossible for me to track what every assistant does."
>
> Q.   So you believe that Susan Palen was trying to hide evidence after notice of the lawsuit.
>
> (Mr. Zacherl): Object to form.
>
> Q. (Mr. Kelly):   You said that she wanted to get rid of them, correct?
>
> A.   She had told me she did not want them to be seen. I don't know if she wanted to get rid of them. She didn't want them to be seen.
>
> Q.   And that was after notice of the lawsuit, correct?
>
> A.   Yes.

  5. Storick also observed that the fax leads were removed from his 2011 and 2012 files, for those in which a life insurance policy was issued, and placed in a box. According to Storick, Exhibit "A" excerpt, pp. 194 – 196:

  Q. (Mr. Kelly): All right. Any doubt in your mind that there were at least 100 fax leads in the box?

  A. It looked like more, but I'm just saying at least 100. I don't know what is underneath what I didn't see. I can't tell you what was underneath what I didn't see, I saw a lot of faxes. I don't know what was in the whole thing, though.

  Q. (Mr. Zacherl): You're saying you observed, personally, a stack that looked like it was - -

  A. I walked in, it was on the table, you look down and you see all the fax leads.

  Q. And you thought there was at least 100 in there?

  A. At least, but I can't see past the first layer. I mean, I can't – I don't have x-ray eyes.

  Q. Got it, Understood

  Q. (Mr. Kelly): Okay. Now, what do you mean you can't see past the first layer?

  A. I didn't take may hands and go through the box.

  Q. Okay.

  A. I mean, you only see the top layer, you don't see the whole, but I know there should be at least 100 in there or more - -

  Q. Okay

  A. - - based on what I know I wrote.

  Q. All right.

  A. And if they did a good job and actually pulled them out. I don't know if they did a good job and pulled them out. I don't know what they did.

> Q. Right. But you would expect at least 100 to 200 fax leads to be pulled out of the file folders, correct?
>
> A. Yes. And also on the people that weren't placed, there'd be a fax for them too.
>
> Q. How many do you think?
>
> A. I don't know.
>
> Q. Well, can you give me an estimate?
>
> A. I can't guess.
>
> Q. Well, you said there were 30 to 35 on your desk when you got fired, correct?
>
> A. Yeah, but I submitted cases there were declined, there would be file folders on then for it they were declined for alcoholism or Hepatitis C or whatever. I mean they all - - there would be files there.

The foregoing is a synopsis of the conduct of MetLife. The testimony of Alma Dominguez with respect to the review of the 2011 and 2012 Storick files, and removal of the fax leads therein, is extremely lengthy and spans the entirety of pp. 75 – 135, Exhibit "B". Storick also addresses the review and removal of fax leads in his deposition testimony, Exhibit "A" excerpt, pages 184 – 206. And to the extent of the existence of the fax leads placed in the Storick insurance files, Exhibit "C" attached, same is corroborated by the deposition testimony of Nicole Alexander, Exhibit "D" attached hereto and made a part hereof. The entirety of the deposition testimony of Nicole Alexander revolves around the fax leads and the placement of same into the Storick insurance files and MetLife's knowledge of same.

6. Following MetLife's cleansing of the Storick files, it was only then that MetLife, in accordance with *Rule 26(a)(1), Fed. R. Civ. P.*, served its initial disclosures in this lawsuit, Exhibit "E" attached hereto. MetLife's initial disclosures were served on

October 25, 2012. While there is no issue with the extended time frame that it took MetLife to serve its initial disclosures, what is problematic is that the initial disclosures are devoid of anything relating to the Storick insurance files and the faxes contained therein, both with respect to files where insurance was placed (which were the 2011 and 2012 files reviewed) and, as testified to by Storick, for those "on the people that weren't placed" which "there'd be a fax for them too." It appears that by the time the initial disclosures were served, at least with respect to the Storick files reviewed, any fax leads contained therein were cleansed by MetLife.

7. Within a week of MetLife serving its initial disclosures, on November 2, 2012, both Storick and Alma Dominguez are terminated as employees of MetLife. At the time Storick was terminated, he was prevented by MetLife from removing anything from the MetLife office, inclusive some of his own personal items, i.e. laptop. On Storick's office desk, there were additional fax leads. Exhibit "A" excerpt, p. 196, lines 5-20. Following November 2, 2012, there is no amended initial disclosures served by MetLife in accordance with *Rule 26(e)(1)(A), Fed. R. Civ. P.*

8. Then, on November 28, 2012 [D.E. #39], MetLife asserts a crossclaim against Storick alleging common law indemnification and negligence.[2] It should be noted, however, when MetLife initially served its responsive pleading to Plaintiff's complaint, which was on October 11, 2012, there was no crossclaim included against Storick [D.E. #25]. Only after Plaintiff served its amended complaint, and in this case after all the fax leads were removed from the reviewed 2011 and 2012 Storick files and after Storick's office is cleansed, did MetLife serve its crossclaim against Storick.

---

[2] Notwithstanding this motion, Storick also has pending a motion to dismiss against MetLife for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction[D.E. #47]

9.      The Storick insurance files, given the nature of this lawsuit, should not have been touched by MetLife.  A "litigation hold" should have been placed on these files.  Upon being put on notice of this lawsuit, MetLife was required to preserve the Storick files in the manner in which they were immediately prior to learning of this lawsuit, and the same with Storick's desk.  Given MetLife's conduct, MetLife has no doubt spoliated evidence that is crucial to the defense of the crossclaims now pending against Storick.

10.     As part of the indemnification claim, MetLife must prove that it was wholly without fault. As part of the negligence claim, MetLife must prove that Storick breached a duty of care that proximately caused harm to it.  Based upon the deposition testimony, particularly Exhibits "B" and "D", if a Storick client was secured by a fax lead, that fax lead was placed in the insurance file.  The fax lead was affixed on the inside front cover of the file when provided to MetLife management for review.   It is the position of Storick that MetLife, despite any alleged policy prohibiting the practice, was fully aware that Storick was involved in securing potential clients and/or customers by the use of fax leads; that it was known and disclosed to MetLife; and that MetLife condoned the practice thereby waiving any policy.  These fax leads contained in the Storick insurance files would fully support and corroborate Storick's position that MetLife had direct knowledge of his use of fax leads and permitted the use of same, which is crucial to the defense of the crossclaims pending against him, including the issue of causation with respect to the negligence claim.

11.     At this point, it is impossible to independently corroborate the amount of fax leads contained in the Storick insurance files for the years 2011 - 2012.  There is no

way to know whether the Storick files investigated and reviewed contained 8 fax leads, 40 fax leads, or 280 fax leads.  And although only the Storick files for 2011 and 2012 were reviewed by MetLife, the Storick files for 2010 remain a mystery, Exhibit "B", page 88, lines 16 -23;  at this point there is no way to know whether the 2010 files have been contaminated by MetLife.

      12.     The discovery process has been intentionally and prejudicially tainted by MetLife.  The integrity of the process has been corrupted.  Bad faith conduct on the part of MetLife predominates.  There has been unfair prejudice towards Storick  in complete contravention of the discovery process as provided for by the Federal Rules of Civil Procedure.

      WHEREFORE, SCOTT R. STORICK, based upon the above and foregoing, given the spoliation of evidence by METROPOLITAN LIFE INSURANCE COMPANY, respectfully prays that this Court grant this is motion to dismiss the crossclaims of METROPOLITAN LIFE INSURANCE COMPANY with prejudice or, if this Court is not inclined to dismiss with prejudice, to provide alternate sanctions, such as the entry of an order providing for the following presumptions (a)  despite any alleged policy prohibiting the practice, MetLife was fully aware that Storick was involved in securing potential clients and/or customers by the use of fax leads and therefore waived its policy; (b) that it was known and disclosed to MetLife; and ( c) that MetLife not only waived its policies, but condoned the practice of the use of fax leads.

**MEMORANDUM OF LAW IN SUPPORT OF CROSSCLAIM DISMISSAL BASED UPON SPOLIATION OF EVIDENCE OR FOR OTHER SANCTIONSISS**

**I.   STANDARD:**

In *United States v. Lazon*, 639 F.3d 1293, 1302 (11th Cir. 2011), the Eleventh Circuit held, "[W]e have recognized the potential availability of spoliation sanctions in a civil case where a party fails to preserve evidence. See *Flury v. Daimler Chrysler Corp., 427 F.3d 939, 943–44 (11th Cir.2005)*. Spoliation sanctions are "intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Id. at 944.* An "adverse inference instruction" is proper in civil cases where a party has failed to preserve evidence and there is a showing of bad faith in doing so. *Bashir v. Amtrak,* 119 F.3d 929, 931 (11th Cir.1997)." And as set forth in *Flury* 427 F.3d at 945, spoliation sanctions may be "(1) **dismissal** of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator."

As set forth in *QBE Insurance Corporation v. Jorda Enterprises, Inc.*, 280 F.R.D. 694, 696 – 697 (Fla. S.D. 2012),

> Spoliation is the "intentional destruction of evidence or the significant and meaningful alteration of a document or instrument." *Southeastern Mech. Servs., Inc. v. Brody,* 657 F.Supp.2d 1293, 1299 (M.D.Fla.2009) (citing *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.,* 341 F.3d 1292, 1308 (11th Cir.2003)). Spoliation is established where the moving party demonstrates (1) the missing or destroyed evidence existed at one time, (2) the non-moving, allegedly spoliating party had a duty preserve the evidence, and (3) the allegedly spoliated evidence was *crucial* to the movant's ability to prove a *prima facie* case or defense. *Managed Care Solutions,* 736 F.Supp.2d at 1322 (quoting *Walter v. Carnival Corp.,* No. 09–20962–CIV, 2010 WL 2927962, at *2 (S.D.Fla. July 23, 2010)).
>
> In meeting the requirement to demonstrate that the spoliated evidence was **crucial** to the movant's ability to prove its *prima facie* case or defense, it is not enough that the spoliated evidence would have been relevant to a claim or defense. *Managed Care Solutions,* 736 F.Supp.2d at 1327–28 (finding that the allegedly spoliated evidence was not crucial to the plaintiff's claims because it could still prove its case through other

evidence already obtained elsewhere). *See also* Floeter v. City of Orlando, 6:05–cv–400–Orl–22KRS, 2007 WL 486633, at *6 (M.D.Fla. Feb. 9, 2007) (missing emails may be relevant to Plaintiff's case but they were not critical and would have been cumulative).

Point Blank Solutions, Inc. v. Toyobo Am., Inc., No. 09–61166–CIV, 2011 WL 1456029, at *8 (S.D.Fla. Apr. 5, 2011) (emphasis in original).

To demonstrate what type of evidence is (or is not) crucial, a recent case illustrates what *does* constitute "crucial" evidence. In Kraft Reinsurance Ireland, Ltd. v. Pallets Acquisitions, LLC, 843 F.Supp.2d 1318, 1324–26, 1:09–CV–03531–AT, 2011 WL 7316303, at *4–5 (N.D.Ga. Dec. 5, 2011), several pallets of food were exported from the United States to Panama but arrived with unsafe levels of mold. Pallets Acquisitions, LLC was the company that exclusively supplied the insured food producer with wooden shipping pallets. The food producer's cargo insurance company, Kraft Reinsurance, claimed that the mold was caused by the pallets. However, the pallets and food at issue were destroyed by the insured before Pallets Acquisitions or the insurance company's experts were able to examine them. Pallet Acquisitions contended that the destruction of this evidence constituted spoliation and moved the district court to exclude the insurance company's expert causation testimony. The district court agreed and imposed the requested sanction because Pallet Acquisitions was never able to inspect the critical evidence and therefore had no suitable way to rebut the insurance company's theory of causation.

Herein, with respect to the crossclaims against Storick, there are no experts disclosed by MetLife to be relied upon by it at trial, nor is the crossclaim, for that matter, to be heard by a jury. Although Storick has yet to serve a responsive pleading directed at the crossclaim, MetLife did not demand trial by jury. Thus, the sanction to be imposed should this Court grant this motion, unless other sanction is imposed, should be the dismissal of MetLife's claim with prejudice.

**II.    THE MISSING OR DESTROYED EVIDENCE EXISTED AT ONE TIME:**

While the credibility of Storick will likely be subject to aggressive attack because he is an interested party, neither Alma Dominguez, nor Nicole Alexander, have anything to gain by providing false testimony. Arguably, since Alma Dominguez was also terminated by MetLife at the same time as Storick, her credibility may even be called into

question, however, Nicole Alexander has no axe to grind with either party and is completely disinterested. Nicole Alexander is objective, credible, and certainly corroborates the existence of fax leads placed into the Storick insurance files.

Fax leads were contained in the Storick files, inclusive of those files submitted to underwriting that did not result in the issuance of a life insurance policy, Exhibit "A" except, p. 196, lines 8 – 20. These fax leads are crucial to Storick's defense of the counterclaims. And the issue is not the existence of any fax leads actually produced by MetLife, but the quantity; the actual amount. To the extent that MetLife asserts fax leads were produced, unfortunately, Storick would be forced to take MetLife at its word. There has never been any initial disclosure, supplemental disclosure, nor any prior opportunity to independently verify and corroborate.

### III.   THERE WAS A DUTY TO PRESERVE THE EVIDENCE:

As set forth in *Managed Care Solutions, Inc. v. Essent Health Care, Inc.*, 736 F. Supp.2d 1317, 1324 (S.D. Fla. 2010), "A party has an obligation to retain relevant documents, including emails, where litigation is reasonably anticipated. See *Southeastern Mechanical Services, Inc. v. Brody,* No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D.Fla. Jul. 24, 2009)* (noting that "[o]nce a party files suit or reasonably anticipates doing so ... it has an obligation to make a conscientious effort to preserve electronically stored information that would be relevant to the dispute."); *Wilson v. Wal-Mart Stores, Inc.,* No. 5:07-cv394-Oc-10GRJ, 2008 WL 4642596, at * 2 (M.D.Fla. Oct. 17, 2008) (footnote omitted) (stating that "the law imposes a duty upon litigants to keep documents that they know, or reasonably should know, are relevant to the matter.")". And it does not make a difference who initiated the lawsuit or whether the information is electronic or

simply printed documentation as seen in *Wilson v. Walmart Stores, Inc.*, 2008 WL 4642596 (M.D. Fla. 2008).  The preservation of information simply rests on the idea that if a party anticipates the filing of a lawsuit, if the party filed a lawsuit, or if the party is subject to a lawsuit, that party needs to preserve the documents it knows or reasonably should know, are relevant to the lawsuit.  *See Also*, *Point Blank Solutions v. Toyobo America, Inc.*, 2011 WL 1456029, *10 - 12 (S.D. Fla. 2011).

   The fax leads in the Storick files and on his desk were crucial to preserve.  Not only are the fax leads relevant to the underlying TCPA lawsuit filed by Plaintiff, which revolves around the sending of faxes and MetLife's complicity, it is entirely relevant to the crossclaim actions filed by MetLife against Storick.  The duty even extends beyond merely preserving the fax leads.  MetLife had a duty to keep the files in the same condition they were at the time it received notice of this lawsuit so that honest, independent, review could be made by way of the discovery process as authorized by the Federal Rules of Civil Procedure.  By keeping the existing files in the condition they were in at the time it received notice of this lawsuit, a "litigation hold", no prejudice to MetLife would have resulted.  But by taking upon itself the opportunity to cleanse the Storick's files, MetLife has tainted the discovery process and called into doubt the veracity of the process by forcing Storick to rely solely upon the representations of MetLife and what it chooses to produce.  As stated, the integrity of the discovery process has been corrupted. Upon learning of this lawsuit, no different than that involving electronic discovery, MetLife should have immediately put a "litigation hold" on the Storick files and enforced a "laissez faire" policy of hands-off.  *Point Blank Solutions, Inc.*, 2011 WL 1456029 at *11 relying upon *Fed. R. Civ. P. 37, advisory committee notes*

*to 2006 amendments.*

## IV. THE EVIDENCE WAS CRUCIAL TO STORICK'S ABILITY TO PROVE A PRIMA FACIE DEFENSE TO THE CROSSCLAIMS

Given MetLife's conduct, there is no way to independently corroborate the number of the fax leads contained in the Storick insurance files for the period of 2010 – 2012. Other than taking MetLife at its word, the ability to independently corroborate and verify the amount of the fax leads contained in the Storick files has been lost.

Count I of MetLife's crossclaim against Storick is a claim based upon indemnification. In order to prevail, MetLife needs to prove that it is wholly without fault. The amount of the fax leads contained in the Storick files for the period of 2010 - 2012 is crucial to Storick's defense that despite any alleged policy prohibiting the practice, MetLife was fully aware that Storick was involved in securing potential clients and/or customers by the use of fax leads; that it was known and disclosed to MetLife; and that MetLife not only waived its policies, but condoned the practice of the use of fax leads. A sporadic fax lead "here or there" arguably may get by MetLife review, but if there are many, many such fax leads contained the Storick files that went through MetLife management, as testified to by Alma Dominguez and Nicole Alexander, Exhibits "B" and "D", both from an evidentiary and credibility point of view, MetLife's position that it was wholly without fault becomes unsustainable.

Count II of MetLife's crossclaim against Storick is a claim based upon negligence. In order to prevail, MetLife needs to prove that Storick had a duty of care, breached that duty of care, and proximately caused damage to MetLife. Hereto, the amount of the fax leads contained in the Storick files for the period of 2010 -2012 is crucial to Storick's defense. If the quantity of the fax leads contained in the Storick

insurance files were/are sufficiently large enough, despite any alleged duty not to engage in faxing or the use of fax leads, Storick's defenses would include that MetLife was fully aware that Storick was involved in securing potential clients and/or customers by the use of fax leads; that it was known and disclosed to MetLife; and that MetLife not only waived its policies, but condoned the practice of the use of fax leads.  If the Storick files were not touched by MetLife, if these files were not cleansed, there would have been an objective mechanism available for all parties to investigate and evaluate the fax leads contained therein, as opposed to now being forced to take MetLife at its word.  Not only is the evidence crucial to the element of duty, inclusive of the waiver of same, it is crucial to the element of causation and the defense of comparative negligence.  The case of *QBE Insurance Corporation.*, 280 F.R.D. at 697, citing to [Kraft Reinsurance Ireland, Ltd. v. Pallets Acquisitions, LLC, 843 F.Supp.2d 1318, 1324 26, 1:09–CV–03531–AT, 2011 WL 7316303, at *4–5 (N.D.Ga. Dec. 5, 2011)](), illustrates what "crucial" evidence is, to wit: as a result of certain pallets and food being destroyed prior to the opportunity to inspect, it was determined that there was no suitable way to rebut the theory of causation.  Herein, MetLife going into the Storick files and removing the fax leads is no different than the complete destruction of said pallets and food.  Once MetLife went into the files to remove the fax leads, Storick at that point was and now is subject to MetLife's mercy, being forced to rely upon whatever MetLife decides to produce and represent.

**V.      BAD FAITH:**

There is no term, other than bad faith, that can be applied to MetLife's conduct. Subsequently to being placed on notice of this lawsuit, MetLife: (1) In October, 2012, MetLife management in the Fort Lauderdale office reviews the Storick files for 2011 and

2012 and removes fax leads; (2) Following the conduct of MetLife at the local Fort Lauderdale office, MetLife auditors then come in to review the Storick files; (3) In the meantime, MetLife serves its responsive pleading containing no crossclaim against Storick; (4) MetLife then serves its initial disclosures without even mentioning the Storick files and fax leads contained therein; nor at any point does Met Life supplement its initial disclosures; (5) Storick is then summarily terminated from his position; (6) Subsequently, after Plaintiff amends it complaint, Storick is then sued by MetLife. This was not just a series of coincidences, but the intentional, willful, and deliberate acts on the part of MetLife to destroy or otherwise conceal crucial evidence.

The issue is not about an accidental lost document or an item unintentionally misplaced. MetLife specifically and deliberately ordered a review of the Storick files for 2011 and 2012 with direct orders to remove the fax leads contained therein, to "get rid of them" in order to clean up the files. Exhibit "B", p. 78, lines 1 -6; p. 115, lines 4 -25; p. 117, lines 10 -25; p. 118, lines 1 – 25. MetLife producing a fax lead or two or three is insufficient. MetLife should have quarantined the Storick files, placed a "litigation hold" hold on them, and then disclosed same. As opposed to MetLife engaging in advanced reconnaissance for purposes of disclosure, it engaged in search and destroy and anything now presented by MetLife is unreliable and tainted to the prejudice of Storick.

VI. **CONCLUSION:**

The position advocated by Storick with respect to the spoliation of evidence on the part of MetLife has merit and warrants sanctions. Storick has presented a prima facie case, walking this Court through the necessary elements, legally and factually, to prove its position. Given that this matter is non-jury and that there is a complete lack of

reliability with respect to the amount of fax leads produced by MetLife as contained in the Storick files, an order with respect to a presumption appears insufficient. Storick seeks a dismissal of the crossclaim with prejudice. But to the extent that this Court may find other sanctions appropriate, Storick requests that an order be entered providing for the following presumptions: (a) despite any alleged policy prohibiting the practice, MetLife was fully aware that Storick was involved in securing potential clients and/or customers by the use of fax leads and thereby waived its policy; (b) that it was known and disclosed to MetLife; and ( c) that MetLife not only waived its policies, but condoned the practice and use of fax leads.

## CERTIFICATE OF GOOD FAITH ATTEMPT TO RESOLVE

I HEREBY CERITY that pursuant to Local Rile 7.1(a)(3), undersigned counsel conferred with all parties, or non-parties, who may be affected by the relief sought in the above motion in a good faith effort to resolve all issues raised therein.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of January, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF of in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

    s/ Howard Poznanski, Esquire
HOWARD POZNANSKI, ESQUIRE
Florida Bar No.: 0814946
E-Mail: howardwpoznanski@bellsouth.net
Howard Poznanski Attorney at Law
4800 North Federal Highway
Suite 208A
Boca Raton, Florida  33431
Telephone: (561) 417-9294
Facsimile:  (561) 417-9422
Attorney for Defendants:
    Scott R. Storick, individually
    Storick Group, Co.
    The Storick Group Corporation

Service List:

Ryan M. Kelly, Esquire
rkelly@andersonwanca.com
Anderson Wanca
3701 Algonquin Road
Suite 760
Rolling Meadows, Illinois  60008
Tel:  (847) 368-1500
Fax: (847) 368-1501
      Counsel for Plaintiff(s)
      Served by CM/ECF


Shutts & Bowen, LLP
Frank Zacherl, Esquire
fzacherl@shutts.com
201 South Biscayne Boulevard
1500 Miami Center
Miami, Florida  33131
Tel:  (305) 358-6300
Fax:  (305) 381-9982
      Counsel for Defendant, MetLife
      Served by CM/ECF

Shutts & Bowen, LLP
Daniel T. Stabile, Esquire
dstabile@shutts.com
201 South Biscayne Boulevard
1500 Miami Center
Miami, Florida  33131
Tel:  (305) 347-7305
Fax:  (305) 347-7307
      Counsel for Defendant, MetLife
      Served by CM/ECF